**QUESTAR DATA SYSTEMS, INC., Relator,**

v.

**COMMISSIONER OF REVENUE, Respondent.**

No. C9–95–1880.

Supreme Court of Minnesota.

July 11, 1996.

Lawrence C. Brown, Walter A. Pickhardt, Faegre & Benson, Minneapolis, for Relator.

Hubert H. Humphrey, III, Attorney General, Michael M. Owen, Assistant Attorney General, St. Paul, for respondent.

Paul A. Zimmer, David E. Flotten, Courey, Albers, Kosanda & Zimmer, P.A., Minneapolis, for amicus curiae.

OPINION

PAGE, Justice.

Questar Data System, Inc. (Questar), petitioned this court for a writ of certiorari to review an order of the Minnesota Tax Court affirming the Commissioner of Revenue's (Commissioner) use tax and interest assess-

ment in the amount of $147,594.33.[1] The assessment was based on unpaid use tax allegedly owed by Questar for the tax period October 1, 1989, through September 30, 1992. According to the Commissioner, Questar is a provider of research services and failed to pay the required use tax on certain printed materials used in providing research services to its customers. Questar appealed to the tax court, raising the issue of whether Questar, under Minn.Stat. § 297A.14, subd. 1 (1994), used the printed materials in the regular course of its business or whether it sold the printed materials to its customers. After a hearing, the tax court issued its findings of fact, conclusions of law, and order for judgment affirming the use tax assessment, concluding that the printed materials were used by Questar in providing research services. We reverse.

Questar, a Minnesota corporation with its principal place of business in Eagan, Minnesota, is a full-service survey-based research company that provides a number of consulting and data processing services to its customers, including data tabulation and analysis, development and design of printed materials, and preparation of reports. Questar's services are sold to the customer a la carte; that is, the customer may purchase any one service or any combination of services as the customer sees fit. Questar's customers include business customers who conduct customer and employee opinion surveys and governmental, nonprofit, and school system customers who conduct various kinds of surveys and standardized tests.

When Questar pursues a contract with a customer, Questar sends the customer a Request for Proposal (RFP), outlining the itemized costs for services either requested by the customer or deemed appropriate by Questar for the customer. The costs for printed materials and data collection and analysis services are separately itemized on the RFPs. Over 80 percent of Questar's contracts call for Questar to provide printed materials in addition to other services. When invoicing customers, Questar separately itemizes the cost for printed materials, the cost for any consulting services, and the cost for data tabulation and analysis services. The itemized cost for printed materials includes a markup of 25 to 100 percent over Questar's actual cost.

Some of Questar's customers develop and design their own printed materials, while others rely on Questar to assist them in the development and design of printed materials. Once the customer gives final approval, Questar subcontracts the actual printing of the materials to outside vendors. Though Questar does not apply for a copyright, the printed materials are stamped with a copyright symbol, along with the year and the customer's name. Questar issues a resale exemption certificate to the vendor and does not pay a sales tax on its purchase of the printed materials. The printed materials are then distributed as directed by the customer.

For customers purchasing data tabulation and analysis services, either the customer or the survey participant returns the printed materials to Questar. The results are then submitted to the customer either in report form or on a data tape. Once the results are submitted to the customer, Questar either stores, returns, or disposes of the printed materials as directed by the customer. When printed materials are stored longer than one year, Questar contacts the customer and requests permission to destroy the materials. For an additional fee, Questar will continue to store the printed materials for the customer.

█ In reviewing tax court decisions, we are limited by Minn.Stat. § 271.10, subd. 1, to determining: (1) whether the tax court lacked jurisdiction; (2) whether the tax court's decision was supported by the evi-

---

1. Questar concluded, after the assessment, that some use tax was owed. Thus, it paid tax and interest in the amount of $13,937.70 for materials used in preparing data reports, materials used for internal purposes, and printed materials provided to the customer where Questar did not separately itemize its charges for the printed materials and its charges for services. The term "printed materials" refers to any or all of the following: survey questionnaires, test booklets, survey and test instructions, administrative materials, return envelopes, sample tests, business reply envelopes, and notification postcards.

dence or in conformity with law; or (3) whether the tax court committed an error of law. *Homart Dev. Co. v. County of Hennepin,* 538 N.W.2d 907, 910 (Minn.1995). Where we apply the law to facts, as in this case, the question becomes one of law, and we exercise our plenary power. *Morton Bldgs. v. Commissioner of Revenue,* 488 N.W.2d 254, 257 (Minn.1992).

The "general goal of the sales and use tax statutes [is] * * * to establish a complementary scheme whereby everything is presumed taxable unless specifically exempted." *Morton Bldgs.,* 488 N.W.2d at 258. Minnesota Statutes section 297A.14, subdivision 1, provides in pertinent part:

> For the privilege of using, storing, distributing, or consuming in Minnesota tangible personal property or taxable services purchased for use, storage, distribution, or consumption in this state, a use tax is imposed on every person in this state * * * on the sales price of sales at retail of the items * * *.

Therefore, Questar is obligated to pay a use tax for tangible personal property it uses, stores, distributes, or consumes in Minnesota, or to collect a sales tax where required by Minn.Stat. § 297A.02, subd. 1. "Use" is defined as including "the exercise of any right or power over tangible personal property * * * purchased from a retailer incident to the ownership of any interest in that property, *except that it does not include the sale of that property in the regular course of business.*" Minn.Stat. § 297A.01, subd. 6 (emphasis added).

Here, we must decide whether Questar's purchases and transfer of the printed materials to its customers are exempt from the use tax as a sale within the regular course of Questar's business. Our inquiry into this issue is complicated by the fact that after the printed materials are transferred to and used by the customer, some of the materials are later returned to Questar for its use in tabulating and/or analyzing the data contained on them. The Commissioner contends that Questar's primary business is the sale of consulting and data processing services and that the use of the printed materials is a component of that sale and does not involve a separate sale of the printed materials to the customer.

To make our determination, we objectively examine the essence of the transaction between Questar and its customers. *See Hirschfeld Press v. City and County of Denver,* 806 P.2d 917, 920–21 (Colo.1991) (adopting a "primary purpose" test as an objective measure to determine if a printer was subject to a use tax on pre-press materials used in printing); *Consolidated Freightways v. Department of Revenue,* 112 Idaho 652, 735 P.2d 963, 967 (1987) (adopting a "real object" of the transaction test to determine if an interstate transport carrier was subject to a use tax on purchases of tariff schedules). Looking at the essence of the transaction, we conclude that the transfer of printed materials from Questar to its customers constitutes a sale of property to the customers in the regular course of Questar's business and not the exercise of any right or power over tangible personal property incident to the ownership of any interest in that property.

First, the printed materials are designed for the customers' needs, and in and of themselves, do not contain any information useful to Questar. Questar has no control over who receives the printed materials, who returns the printed materials, or the number that will in fact be returned. It is not until the surveys and questionnaires are answered or the tests are completed that any information of value is contained on the printed materials, and it is not until they are returned to Questar that the materials are "used" by Questar. This use of the printed materials comes well after and is secondary to the customers' use of the printed materials. Further, while Questar may tabulate and/or analyze the information contained on the printed materials which are returned, Questar has no ownership interest in the information itself. Finally, Questar transfers the title of the printed materials to the customer as evidenced by: (1) the copyright symbol and the customer's name being printed on the materials; (2) the customer determining how printed materials were to be distributed; (3) the fact that not all printed materials provided to the customer, *e.g.,* survey and testing instructions, are intended to be returned to Questar; (4)

Questar separately itemizing the cost of the printed materials when invoicing the customer; (5) Questar charging the customer a markup of 25 to 100 percent over actual cost for printed materials; (6) the customer directing Questar as to how the materials are to be disposed of; (7) Questar charging the customer an additional fee for storing printed materials beyond one year; and (8) Questar never asserting an ownership interest in the printed materials after their transfer to the customer.

■ Because Questar's transfer of the printed materials to its customers constitutes a sale of property in the regular course of its business, the materials are not "used" by Questar within the meaning of Minn.Stat. § 297A.14, subd. 1, and are therefore not subject to Minnesota's use tax.[2]

Reversed.

STRINGER, Justice (dissenting).

I respectfully dissent. I agree with the majority that the ultimate question here is whether the "essence of the transaction"[1] was the sale of printed material, or whether the printed material supplied was merely incidental to that for which Questar's customers contracted—the data results. In concluding it is the latter, I resort to the time honored axiom that we should not exalt form over substance. I would affirm the tax court.

The transaction here is not complicated. Questar's customers want information that can only be developed through questionnaires to be used in market surveys and the raw data from the completed questionnaires are processed by Questar into the form the customer desires. The questionnaire is nothing more than a tool in gathering the raw data; in and of itself it is of no value to Questar's customers. It attains value only when it has been filled out by its recipient and provides information that, when pro-

cessed by Questar in conjunction with all the other completed questionnaires, will produce the information Questar's customer seeks.

In determining whether Questar sold the printed materials or used them in its business for purposes of which tax is applicable, we really need go no further than Questar's own description of its operations: "Our approach integrates knowledge of survey techniques and statistical analysis procedures, superior data capture and data management processes and state-of-the-industry data display software." Questar Data Systems, Inc., Proposal for the Mayflower Group 1 (January 17, 1992). Presumably those customers who could process their own data would do so, and in such cases would purchase only the materials. But for those instances there is no quarrel; a sales tax is payable. We deal here with instances where the customer, for whatever reason, chooses not to process the raw data and relies on Questar to provide it with a package of services designed to produce for the customer the desired information.

The majority's focus on the formalism of the customer's name on the materials, the separate billing for the materials, and who has custody of the materials and when, to reach its conclusion that the questionnaires are sold by Questar and are not used by it seems to wholly miss the point: Questar's customers seek information, not a stack of blank questionnaires accompanied by instructions on how to complete them. As the tax court found: "Questar is in the business of gathering information for its clients through surveys and tests" and "uses the Printed Materials in its business whenever it provides Data Processing Services and Printed Materials to its clients." There was ample evidence to support the tax court finding that in these circumstances the printed materials are *used* by Questar for purposes of 297A.14, subd. 1.

2. Obviously, Questar is required, where applicable, to collect the appropriate sales tax. Minn. Stat. § 297A.02, subd. 1. Further, printed materials such as those identified in footnote 1 that Questar uses in conducting its business are subject to tax under Minn.Stat. § 297A.14, subd. 1.

1. Cf. *Fingerhut Prods. Co. v. Commissioner of Revenue, 258 N.W.2d 606, 610 (Minn.1977)* (implicitly approving the "essence of the transaction" approach in deciding whether mailing lists rented by a direct mail merchandiser from mailing list brokers constituted tangible personal property within the contemplation of Minn.Stat. § 297A.14).

The notion of focusing on the "essence of the transaction" is carried over to Minn. R. 8130.9700, subp. 4 (1995), and a comparison is helpful. Addressing the tax status of providing primarily a data processing service to the customer's data, the rule states that "[t]he *true object* of these contracts is considered to be a service, *even though some tangible personal property is incidentally transferred to the client." Id.* (emphasis added).

Finally, it is of concern that the majority seems to have permitted Questar to success-fully shape the taxability of its transaction with its customers through a series of formalistic steps that substantively have little meaning; the notion of "the essence of the transaction" seems to have been lost.