ANDERSON, Justice.
Appellant Tony Webster requested public government data from respondents Hennepin County, et al. (the County), under the Minnesota Government Data Practices Act (the Data Practices Act). See Minn. Stat. §§ 13.01 -.90 (2016). The Data Practices Act governs the storage of government data and public access to government data. We are asked to decide whether the County's established procedures, arrangement of records, and refusal to comply with part of Webster's government-data request violated the Data Practices Act. We hold that there is substantial evidence in the record to support the conclusion of the Administrative Law Judge (ALJ) that the County's established procedures do not "insure" prompt responses to requests for data. We further hold that there is not substantial evidence in the record to support the conclusion of the ALJ that the County's arrangement of records violates the Data Practices Act. But we do not decide whether Webster's request was valid or whether the County may refuse to comply with a request that the County deems "unduly burdensome" because we lack appellate jurisdiction over these issues.
FACTS
In August 2015, Webster submitted a government-data request to the County for data about the County's use or planned implementation of mobile biometric technologies.[1] Webster sent the request to *424 Kristi Lahti-Johnson, Carrie Hill, and two others. Lahti-Johnson is the Hennepin County Data Governance Officer and serves as the County's "[r]esponsible authority" under the Data Practices Act. See Minn. Stat. § 13.02, subd. 16. Carrie Hill is the "responsible authority" under the Data Practices Act for the Hennepin County Sheriff's Office (the Sheriff's Office). Webster's request listed 14 items. Items 1 through 4 were requests to inspect data. Items 5 through 13 were a set of questions about the use of biometric technology. Item 14 requested:
Any and all data since January 1, 2013, including emails, which reference biometric data or mobile biometric technology. This includes, but is not necessarily limited to emails containing the following keywords, which I request the County conduct both manual individual searches and IT file and email store searches for:
a. biometric OR biometrics
b. Rapid DNA
c. facial recognition OR face recognition OR face scan OR face scanner
d. iris scan OR iris scanner OR eye scan OR eye scanner
e. tattoo recognition OR tattoo scan OR tattoo scanner
f. DataWorks
g. Morphotrust
h. L1ID or L-1 Identity
i. Cognitec
j. FaceFirst
Two days after submitting his request, Webster emailed the County, asking for confirmation that his request was received. Later that day, the County confirmed receipt and reported that the County was processing the request.
During the following three months, Webster and the County corresponded over the status of the request. Each time Webster inquired about the status of his request, the County assured him that it was processing the request. In early November, Webster called Lucie Passus-an assistant to Lahti-Johnson and a responsible authority designee for Hennepin County. See Minn. Stat. §§ 13.02, subd. 6, 13.03, subd. 2. Passus told Webster that the request was being processed, and that she could not disclose what the County was doing to comply with Webster's request, who was working on the request, or whether the County was experiencing difficulty in responding to the request.
After receiving Webster's request in mid-August, Lahti-Johnson surveyed the County's departments to determine where data responsive to Webster's request was stored. Lahti-Johnson met with approximately 25 employees from the Sheriff's Office, the County Attorney's Office, the Department of Community Corrections and Rehabilitation, Human Resources, the Medical Examiner's Office, Emergency Management, Purchasing and Contract Services, and the Information Technology Department. Lahti-Johnson explained the request to department employees and also discussed the use of biometric technology by the departments. She determined whether the departments had contracts or grants with vendors responsive to the request, whether the County collected biometric data responsive to the request, and how the County transferred collected biometric data to the State.
In late November, Lahti-Johnson sent Webster a letter with responses to requests 1 through 13.[2] Although items 5 *425 through 13 were questions, and perhaps not valid data requests, Lahti-Johnson responded to those inquiries because she wanted to be responsive, transparent, and demonstrate that little biometric technology was in use. Lahti-Johnson concluded that quibbling with a requester over the form of the request would ultimately result in more work than just answering the improper request in the first place. Lahti-Johnson also thought that the answers to the questions might help Webster narrow item 14 in his request.
With respect to item 14, Lahti-Johnson said the request was "too burdensome with which to comply." In her letter to Webster, Lahti-Johnson stated that a test examination for emails responsive to the request returned 312 emails after 7 hours of searching. Lahti-Johnson calculated a responsive search would "tie up Hennepin County's servers 24 hours a day for more than 15 months." Lahti-Johnson told Webster the response to his request was complete, but also stated that the County would continue to work with Webster "to determine a reasonable limitation" to item 14 of his request.
In early December, Webster responded to Lahti-Johnson that taking 15 weeks to raise the issue of undue burden was concerning to him, but he narrowed item 14 of his request to only emails of employees of the Sheriff's Office, the Security Department, and any County employees providing services to those departments. Webster also stated that he thought that the County had violated the Data Practices Act and that he was retaining counsel. Three days later, Webster's attorney contacted the County, asking it to retain the requested data because of the potential for litigation.
In mid-December, Lahti-Johnson sent Webster a letter telling him that the Sheriff's Office should be his point of contact on item 14 (as narrowed) because responsive data would be under the purview of the Sheriff's Office. In late December, the Sheriff's Office emailed Webster that the office was "continuing to explore the options regarding [the] revised request from December 4th, specifically as it relates to 'Request Item 14.' "
On January 7, 2016, Webster filed an expedited data practices complaint with the Office of Administrative Hearings (OAH). The County filed a response, and the ALJ assigned to this dispute issued a notice of probable cause and an order for a prehearing conference. See Minn. Stat. § 13.085. The ALJ held a hearing on the merits, received 77 exhibits, and heard testimony from six witnesses.
Testimony during the hearing revealed that the County uses Microsoft Exchange Server 2010 and that the County's email system is distributed across 19 servers. Emails are stored as PST files.[3] Emails are indexed by sender, receiver, subject, date, and attachment name. The County does not index words in the body of, or attachment to, an email. The County also *426 does not routinely classify email or attachments as public or not public data.
Glen Gilbertson, the County's Chief Technology Officer, testified that the County's email system had 13,163 accounts and 208,936,308 emails, amounting to 23.56 terabytes in size. Gilbertson said that the County receives about 6 million emails per month, 70 percent of which are spam. Christopher Droege, a computer forensics supervisor, testified that about 8,000 of the 13,163 accounts were individual user accounts.
Droege conducted three sets of searches for emails responsive to Webster's request; these searches occurred on September 18, 2015, on January 6-11, 2016, and on January 19, 2016. For the initial search on September 18, Droege asked a system administrator for copies of the email mailboxes of five employees. Droege then transferred the copies of those mailboxes to a separate personal computer used for forensics purposes. Using a proprietary program, Droege searched the five mailboxes for emails responsive to Webster's request and found 312 responsive emails. Although Webster requested data "after January 1, 2013," Droege did not limit the range of the searched emails by date; an appropriately date-limited search would have complied with Webster's request and taken less time. After the Data Governance Office and County Attorney's Office reviewed the 319 emails, 259 were provided to Webster for inspection.
Webster sent his narrowed item-14 request on December 4, 2015. In response to the narrowed request, Droege conducted a second set of searches between January 6 and January 11. Droege used the Exchange Control Panel (ECP) to conduct the searches because he thought searches performed "directly onto the server" were faster and the best way to promptly find responsive data. Droege split the searches into ranges based on the first letter of first names. He then searched for six of Webster's 20 keywords in the mailboxes of all 868 employees of the Sheriff's Office and the Security Department. Droege created a PST file of 4,249 responsive emails, but did not deduplicate[4] the emails.
On January 19, 2016, Droege conducted a third and final set of searches on the mailboxes of 88 Sheriff's Office employees using the remaining 14 keywords. That search took 2 hours and resulted in 1,726 responsive emails. The County did not provide the results of Droege's second and third set of searches to Webster.
The ALJ found that completing the searches for responsive emails would take approximately 18 hours. Though not expressed in the decision, the ALJ's finding appears to be calculated based on Droege's testimony that his January 19 search would have taken 20 hours if done on the mailboxes of all 868 Sheriff's Office and Security Department employees. Having already searched all 868 mailboxes for six of the search terms, the only remaining searches would be the other 14 search terms on the 780 mailboxes Droege did not search on January 19. Thus, 2 hours of the 20-hour search had already been conducted. In other words, 18 hours of search time remained. That conclusion, however, relates to Webster's narrowed request on December 4, 2015, not to the original request.
The ALJ concluded: (1) that the County's established procedures did not ensure that requests for government data were received and complied with in an appropriate *427 and prompt manner; (2) that the County had not kept email correspondence and attachments in an arrangement and condition making them easily accessible for convenient use; and, (3) that the County unlawfully refused to permit Webster to inspect and copy all of the public government data he requested. The County obtained a stay of the decision from the ALJ.[5] The court of appeals reversed the first two conclusions and affirmed the third. Webster v. Hennepin Cty. , No. A16-0736, 2017 WL 1316109, at *1 (Minn. App. Apr. 10, 2017). We granted Webster's petition for review.
ANALYSIS
The Data Practices Act governs the storage of government data and public access to that data. Minn. Stat. §§ 13.01 -.90 (2016). Government data include "all data collected, created, received, maintained or disseminated" by counties, "regardless of its physical form, storage media or conditions of use." Minn. Stat. § 13.02, subds. 7-7a, 11. Government data are presumed to be public and available to the public for inspection and copying. Minn. Stat. § 13.01, subd. 3. The presumption that data are public may be overcome only by a contrary federal law, state statute, or temporary classification of data as not public. Id.
Individuals seeking to inspect or copy government data submit a request to a responsible authority or designee. See Minn. Stat. § 13.03, subd. 3(a). The responsible authority or designee must permit inspection or copying of public government data at a reasonable time and place, and must, upon request, inform the requester what the data mean. Id. Responsible authorities are also obliged to establish procedures that insure "requests for government data are received and complied with in an appropriate and prompt manner," id. , subd. 2(a), and to maintain government data in an arrangement that make the data "easily accessible for convenient use," id. , subd. 1.
A requester may file a complaint with the OAH under section 13.085, subdivision 2, alleging a violation of chapter 13, to compel compliance with a request for government data. Ultimately, an ALJ determines whether the complained-of conduct violated the Data Practices Act and
must make at least one of the following dispositions ... :
(1) dismiss the complaint;
(2) find that an act or failure to act constituted a violation of this chapter;
(3) impose a civil penalty against the respondent of up to $300;
(4) issue an order compelling the respondent to comply with a provision of law that has been violated, and may establish a deadline for production of data, if necessary ....
Minn. Stat. § 13.085, subd. 5(a). A party aggrieved by the decision of the ALJ is entitled to judicial review, id. , subd. 5(d), by petition to the court of appeals for a writ of certiorari, see id. ; Minn. Stat. § 14.63 (2016). Reviewing courts may remand, reverse, or modify a decision
if the substantial rights of the petitioners may have been prejudiced because the administrative finding, inferences, conclusion, or decisions are:
(a) in violation of constitutional provisions; or
(b) in excess of the statutory authority or jurisdiction of the agency; or *428 (c) made upon unlawful procedure; or
(d) affected by other error of law; or
(e) unsupported by substantial evidence in view of the entire record as submitted; or
(f) arbitrary or capricious.
Minn. Stat. § 14.69 (2016).[6]
I.
We begin with whether the County had "established procedures" to "insure" an appropriate and prompt response to Webster's government-data request. The ALJ determined that the County's "established procedures" did not comply with Minn. Stat. § 13.03, subd. 2(a). The court of appeals concluded that this determination was not supported by substantial evidence in the record. Webster , 2017 WL 1316109, at *3. Webster contends that the record contains substantial evidence to support the ALJ's conclusion. Before we examine the decision of the court of appeals, we turn first to the standard of review as set out in Minn. Stat. § 14.69.
A.
The plain text of section 14.69(e) directs appellate courts to reverse a decision of an ALJ when the record does not contain substantial evidence to support the decision. We have defined how to determine whether there is substantial evidence in the record. See, e.g. , In re A.D. , 883 N.W.2d 251, 259 (Minn. 2016). Substantial evidence exists "where, considering the evidence in its entirety, there is relevant evidence that a reasonable person would accept as adequate ...." Id. To satisfy that standard, there must be more than a scintilla of evidence, more than "some" evidence, and more than "any" evidence. Id. The court of appeals found that there was not substantial evidence in the record to support the ALJ's conclusion that the County violated section 13.03, subdivision 2(a), and reversed. Webster , 2017 WL 1316109, at *2-*3. Whether the determination of the ALJ is supported by substantial evidence is a question of law, which we review de novo. See In re Application of Minn. Power for Auth. to Increase Rates for Elec. Serv. in Minn. , 838 N.W.2d 747, 757 (Minn. 2013).
1.
The parties dispute the standard of review and the level of deference given to an ALJ's factual findings and conclusions of law. We conclude that neither party correctly states the applicable standard of review.
Webster argues, and correctly so, that the "substantial evidence" standard is the definition provided in In re A.D. , 883 N.W.2d at 259. See also Minn. Ctr. for Envtl. Advocacy v. Minn. Pollution Control Agency , 644 N.W.2d 457, 464 (Minn. 2002) (applying the same standard (citing Cable Commc'ns Bd. v. Nor-West Cable Commc'ns P'ship , 356 N.W.2d 658, 668 (Minn. 1984) )). Although Webster relies on "contested cases" involving agency determinations in areas of agency expertise, our interpretation of "substantial evidence" in those cases arises from the text of section 14.69 (formerly Minn. Stat. § 15.0425 (1980) ). See Reserve Mining Co. v. Herbst , 256 N.W.2d 808, 825 (Minn. 1977) (holding that section 15.0425 applied alongside other statutory standards and endorsing the definition of substantial evidence); see also *429 In re A.D. , 883 N.W.2d at 259 (restating the definition of substantial evidence in reviewing a decision under section 14.69 ).
But Webster also contends that the ALJ's conclusions of law are due deference from appellate courts. There is no support in our case law for that proposition. This is not a routine administrative law dispute. Here, no board, committee, or commissioner issued a decision that our precedent requires be given deference. Cf. In re A.D. , 883 N.W.2d at 258-59 ; Minn. Ctr. For Envtl. Advocacy , 644 N.W.2d at 464-65 ; Cable Comm. Bd. , 356 N.W.2d at 668 ; Reserve Mining Co. , 256 N.W.2d at 824. Webster further argues that the court of appeals failed to view the record in the light most favorable to the ALJ's decision, relying on Abrahamson v. St. Louis Cty. Sch. Dist. , 819 N.W.2d 129 (Minn. 2012), and White v. Metro. Med. Ctr. , 332 N.W.2d 25 (Minn. 1983). Neither case is instructive here. Abrahamson dealt with judicial review at an earlier stage in the proceedings and does not stand for the proposition that Webster urges here. 819 N.W.2d at 136. In Abrahamson , we stated that in determining whether a complaint filed with the OAH alleged sufficient facts to state a prima facie case, reasonable inferences had to be drawn in the light most favorable to the complainant. Id. Here, we are reviewing a decision on the merits, not a decision on a motion to dismiss.
Similarly, in White , we reviewed a decision disqualifying White from unemployment compensation benefits and applied a "narrow standard of review" to factual findings. 332 N.W.2d at 26. We stated that factual findings , not conclusions of law, must "be viewed in the light most favorable to the decision, and if there is evidence reasonably tending to sustain them, they will not be disturbed." Id. (citing Booher v. Transp. Clearingsof Twin Cities, Inc. , 260 N.W.2d 181, 183 (Minn. 1977) ).[7] In sum, the standard of review for which Webster argues-deferential-is inconsistent with our precedent and the applicable statute.
2.
The County, on the other hand, argues that the standard of review is de novo because the facts are undisputed and the questions presented require the application of law.[8] The County relies on two cases, one in which we reviewed a decision of the Workers' Compensation Court of Appeals, Ekdahl v. Independent School District #213 , 851 N.W.2d 874 (Minn. 2014), and one in which we reviewed determinations of the tax court, Questar Data Systems Inc. v. Commissioner of Revenue , 549 N.W.2d 925 (Minn. 1996). Neither case is instructive here. In Ekdahl , we decided a question of statutory interpretation and stated that we are not "bound by WCCA decisions that rest upon the application of a statute to undisputed facts." 851 N.W.2d at 876. But Ekdahl does not apply here because our review of workers' compensation decisions is not governed by section 14.69. See Minn. Stat. § 176.471 (2016).
In Questar , we applied a statutory standard of review as required by Minn. Stat. § 271.10 (2016). 549 N.W.2d at 927-28. We noted that when we apply the law to facts, *430 we exercise our plenary power because the question before us becomes one of law. Id. at 928. The County does not explain how our plenary power applies in this case, but the implication is that we should review the ALJ's application of the law to the evidence in the record de novo. Questar is also not helpful here because section 14.69(e) considers all evidence in the record, not just the evidence formally relied on by the ALJ. See Minn. Stat. § 14.69(e) (stating that we may act on an ALJ decision that is "unsupported by substantial evidence in view of the entire record as submitted " (emphasis added)).
In sum, Webster and the County both advance standards of review that are inconsistent with section 14.69 and our precedent. We apply section 14.69(e) to determine whether substantial evidence in the record supports the ALJ's conclusion that the County's established procedures did not comply with the Data Practices Act. See, e.g. , In re A.D. , 883 N.W.2d at 259. In determining whether there is substantial evidence in the record, we use the definition discussed above. Id.
B.
We turn next to the question of whether substantial evidence in the record supports the ALJ's conclusion that the County's established procedures violated Minn. Stat. § 13.03, subd. 2(a).
We start with an examination of the decision of the court of appeals. The court of appeals, in determining that the County's procedures failed to comply with the Data Practices Act, reasoned that the ALJ excessively relied on the County's failure to properly respond to Webster's request and did not account for the reality that Webster's request was just one among more than 500 government-data requests received by the County every month. Webster , 2017 WL 1316109, at *2. The court noted that the County had appointed a responsible authority-referring to Lahti-Johnson-who had processes in place for coordinating responses to government-data requests. Id. The court also noted that Lahti-Johnson had 29 data-practices contacts in county departments and that she met weekly with a member of her staff to review the status of pending requests. Id. The court concluded that the record did not reveal, nor did the ALJ specifically cite, any obvious flaws in the County's internal procedures. Id. In addition, although the court also concluded that the County poorly executed its specific response to Webster's specific request, the court found that this sole failure was not enough to support a finding that the County violated Minn. Stat. § 13.03, subd. 2(a). Id.
The court of appeals essentially concluded that a single violation of the applicable statute is not sufficient; put another way, the court's holding suggests that to prevail on a claim under subdivision 2(a), a party must identify, or an ALJ must find, more than just a failure to respond properly with respect to one request.[9] The County advanced this reasoning at the court of appeals and relies on it here.
The threshold issue, therefore, is whether a standard that distinguishes between single and multiple violations is appropriate. This dispute appears to be the first challenge under section 13.03, subdivision 2(a), to receive appellate review. We first look to the text of the statute.
1.
We review questions of statutory interpretation de novo. KSTP-TV v. Metro. Council , 884 N.W.2d 342, 345 (Minn. 2016)
*431 (interpreting Minn. Stat. § 13.43, subd. 1 (2014) ). Our first step in interpreting the language of a statute is to determine "whether the words of the law are clear and free from ambiguity." Staab v. Diocese of St. Cloud , 813 N.W.2d 68, 72 (Minn. 2012). Minnesota Statutes § 13.03, subd. 2(a), provides as follows: "The responsible authority in every government entity shall establish procedures, consistent with this chapter, to insure that requests for government data are received and complied with in an appropriate and prompt manner."
Thus, the proper standard under this statute hinges on the word "insure." The statute commands responsible authorities to "establish procedures ... to insure that requests for government data are received and complied with in an appropriate and prompt manner." Minn. Stat. § 13.03, subd. 2(a) (emphasis added). The Data Practices Act does not define the term "insure." In the absence of a definition in the statute, we often look to dictionary definitions to determine the plain meaning of words. Larson v. Nw. Mut. Life Ins. Co. , 855 N.W.2d 293, 301 (Minn. 2014). "Insure" is commonly defined as "[t]o make sure, certain, or secure," The American Heritage Dictionary of the English Language 911 (5th ed. 2011), and "considerabl[y] overlap[s] ... [with] the meaning and use of ... ensure," The New Oxford American Dictionary 881 (2001). Ensure means to "make certain that (something) shall occur or be the case" and "make certain of obtaining or providing (something)." The New Oxford American Dictionary 566.
Nothing in the text of the statute suggests that a government entity can avoid a violation of the statute as long as that entity does not commit multiple violations. Plainly, the use of "insure" suggests that the "established procedures," when followed, should result in appropriate and prompt responses in all cases . Put another way, the Legislature has not suggested that only a pattern of violations will suffice. We will not read such a standard into the statutory scheme adopted by the Legislature. See Reiter v. Kiffmeyer , 721 N.W.2d 908, 911 (Minn. 2006).[10]
Section 13.03, subdivision 2(a), dictates that government data be made available and that personnel responsible for making it available establish procedures that insure it is made available. It follows, then, that when the procedures are followed and the requested data are not made available appropriately or promptly, the "established procedures" do not insure that government data are properly available. Having determined the applicable rule of law, we must now turn to the facts and the parties' arguments.
2.
The County concedes that its response to Webster's request was untimely-not "prompt." Minn. Stat. § 13.03, subd. 2(a). We recognize, and Webster acknowledges, that not every untimely response will support a finding that a government entity's "established procedures" do not comply with the Data Practices Act. Established procedures fail to insure timely responses when those procedures are the cause of the untimely response. Key to the violation here, therefore, is that the County's established procedures were the cause of the untimely response. The County has "established procedures" or standard practices, followed those procedures *432 or practices, and yet the record contains substantial evidence of the County's missteps and failures in responding to Webster's request at every juncture, leading inexorably to the conclusion that the existing procedures were insufficient to meet the statutory requirements.
The County argues that its procedures are sufficient and were followed. But of the four evidentiary reasons in the record advanced by the County, two are red herrings and two demonstrate instead that the procedures were not sufficient to establish statutory compliance. First, the County notes that it appointed a responsible authority. But the appointment of a responsible authority is simply compliance with a statutory requirement; it does not demonstrate that the County's procedures were adequate. See Minn. Stat. § 13.02, subd. 16. Second, the County offers its "data access policy" as evidence of qualifying procedures. Again, however, that evidence goes to the County's compliance with a separate statutory requirement. See Minn. Stat. § 13.025. Moreover, the "data access policy" does not describe the County's internal procedures for receiving and responding to government-data requests.
Third, the County contends that there are internal, unwritten procedures and policies governing those charged with responding to data requests. Fourth, the County asserts that it has identified responsible personnel for tracking and responding to government-data requests. The existence of "unwritten" policies or procedures for receiving, tracking, and responding to requests that the County claims to have followed demonstrates, however, that the County's "established procedures" are insufficient.
To be clear, nothing in the statute requires written procedures. See Minn. Stat. § 13.03, subd. 2(a). The question is whether the "established procedures" insure that government-data requests are responded to appropriately and promptly. Whether its procedures were written or unwritten, the County contends that it has, and followed, "established procedures," yet admits that it failed to respond in a timely manner. Thus, the procedures on which the County relies did not "insure" that the County appropriately and promptly responded to Webster's requests.
Because we find substantial evidence to support the ALJ's conclusion that the County's procedures did not comply with section 13.03, subdivision 2(a), we reverse the decision of the court of appeals on this issue.
II.
We turn next to the question of whether there is substantial evidence to support the ALJ's conclusion that the County's arrangement of records does not comply with Minn. Stat. § 13.03, subd. 1. We apply the same standard of review to this issue. See In re A.D. , 883 N.W.2d at 259.
The Data Practices Act requires that responsible authorities "keep records containing government data in such an arrangement and condition as to make them easily accessible for convenient use." Minn. Stat. § 13.03, subd. 1. Our task here is to determine whether substantial evidence in the record supports the ALJ's determination that the County's arrangement of records violates the statute. Webster argues that Minn. Stat. § 13.03, subd. 1, must be read as a "functional" rule. Further, Webster contends that the County's delay in responding to his other requests and questions demonstrates that the County's arrangement of records is deficient. Both arguments are unavailing.
First, there is no "functional component" in section 13.03, subdivision 1. The statute *433 simply requires that responsible authorities arrange records that contain government data so as to be "easily accessible for convenient use." Id . How the system of arrangement works, on the one hand, and whether employees are able to use the system, on the other hand, are different questions. The record demonstrates that multi-mailbox keyword searches on a Microsoft Exchange Server are "convenient," and the responsive emails "accessible," when the systems are used as designed. Whether an employee knows how to use the system properly is a question of procedure and management rather than an issue of whether the records are kept in the appropriate "arrangement."
Second, the evidence in the record demonstrates that the County's missteps and delays in responding to Webster's request were not a result of the arrangement of its records but the County's procedures, or lack thereof, for gathering responsive data. The record also demonstrates, however, that the County's email system complies with the Data Practices Act. First, the ALJ found that the County's email system has a standard configuration. Second, the County has the ability to conduct keyword searches of emails and attachments across multiple mailboxes. Third, the County actually conducted keyword searches on multiple mailboxes, obtaining responsive data. This is substantial and persuasive evidence that the County kept its records in "an arrangement and condition as to make them easily accessible for convenient use." Minn. Stat. § 13.03, subd. 1.
Webster and the ALJ do not identify, and we have not found, evidence in the record that demonstrates the requested data were not "easily accessible for convenient use." See id. Because there is not substantial evidence in the record to support the ALJ's determination that the County's arrangement of records did not comply with the Data Practices Act, we affirm the decision of the court of appeals on this issue.
III.
We turn next to the questions of whether Webster's request for emails containing keywords and the County's defense of undue burden comply with the Data Practices Act. Because we conclude that our discretionary jurisdiction to review those questions was not properly invoked, we decline to answer the questions. We recognize that the parties are adverse on these questions, the briefing has provided guidance in answering these questions, and the oral advocacy was thoughtful and helpful. Nevertheless, none of that provides us with jurisdiction.
Webster filed a petition for review under Minn. R. Civ. App. P. 117, subd. 1, identifying three legal issues, the third of which was "[w]hether, under the [Data Practices Act], a government entity may refuse to comply with a data request when that request identifies the data sought by keyword?" On that issue, the court of appeals ruled in Webster's favor, concluding that his request was proper under section 13.03, subdivision 3(a), and rejected the County's argument that it could refuse to comply with the request because it was unduly burdensome. Webster , 2017 WL 1316109, at *4. Webster does not have standing to appeal this portion of the court of appeals' decision because he prevailed at the court of appeals and, ordinarily, a prevailing party does not have standing to appeal a judgment in its favor. See In re D.T.R. , 796 N.W.2d 509, 513 (Minn. 2011).
Standing to appeal is essential to our jurisdiction. Enright v. Lehmann , 735 N.W.2d 326, 329 (Minn. 2007). Even when a party has not raised the issue, we can question a party's standing on our own motion.
*434 Annandale Advocate v. City of Annandale , 435 N.W.2d 24, 27 (Minn. 1989). To have standing to appeal, a party must be aggrieved by the decision of a court from which the party appeals. See In re D.T.R. , 796 N.W.2d at 513 (" 'That a party must be aggrieved in order to appeal remains fundamental' to [Rule 103.03.]" (quoting Twin Cities Metro. Pub. Transit v. Holter , 311 Minn. 423, 249 N.W.2d 458, 460 n.3 (1977) )); In re Trust in Estate of Everett , 263 Minn. 398, 116 N.W.2d 601, 603-04 (1962) ; Singer v. Allied Factors, Inc. , 216 Minn. 443, 13 N.W.2d 378, 380 (1944) ; see also Snyder's Drug Stores, Inc. v. Minn. State Bd. of Pharmacy , 301 Minn. 28, 221 N.W.2d 162, 165 (1974) (adopting injury-in-fact standard for determining whether a claimant has standing). When the adjudication of a court injuriously affects a party's interests, that party is aggrieved and has standing to appeal.[11] In re D.T.R. , 796 N.W.2d at 513.
Clearly, the favorable decision of the court of appeals does not aggrieve Webster. He won. The County is the aggrieved party on this issue. The County, however, did not file a petition for review under Minn. R. Civ. App. P. 117, which requires "[a]ny party seeking review of a decision of the Court of Appeals ... [to] separately petition the Supreme Court."
Instead, the County filed a response to Webster's petition for review under Rule 117, subdivision 4, agreeing that the issues raised by Webster are important. The County contends that we could read its response to Webster's petition for review as a separate petition for review or a request for conditional cross-review. As to the latter argument, subdivision 4 allows a party to request conditional cross-review of additional issues, but only those "not raised by the petition." Id. In fact, Webster raised the validity of the request for emails containing keywords and the County's refusal to comply with the request in his petition for review. The County's response to the petition for review therefore cannot serve as a request for conditional cross-review on that issue.
Nor can we read the County's response as a petition for review. Rule 117, subdivision 1, requires a "party seeking review ... [to] separately petition the Supreme Court." The County did not "separately" petition for review. Reading the County's "response" as a "separate" petition for review would read the requirement for separate petitions in Rule 117, subdivision 1, out of existence.
Webster lacks standing to appeal the decision of the court of appeals on the issues on which he prevailed. The County did not properly seek review of those issues. Our precedent and the applicable rules, therefore, bar us from deciding these issues because we lack jurisdiction. Webster's appeal from the court of appeals' decision on this issue is, therefore, dismissed. See City of St. Paul v. LaClair , 479 N.W.2d 369, 372 (Minn. 1992).
CONCLUSION
For the foregoing reasons, the decision of the court of appeals is affirmed in part, *435 reversed in part, and the appeal is dismissed in part.
Affirmed in part, reversed in part, dismissed in part.
Concurring in part and dissenting in part, Chutich, J.
CONCURRENCE & DISSENT
CHUTICH, Justice (concurring in part, dissenting in part).
I concur with most of the court's decision, but I disagree with the court's conclusion that we lack jurisdiction to review the keyword-search and undue-burden issues, and therefore I dissent from Part III. Like the court, I "recognize that the parties are adverse on these questions, the briefing has provided guidance[,] ... and the oral advocacy was thoughtful and helpful." And I agree with the court that Webster, who prevailed on these issues in the court of appeals, does not have standing to appeal them. But in my view the filing submitted by the County-which undoubtedly had standing to seek review-adequately invoked our jurisdiction on these issues.
Rule 117 of the Rules of Civil Appellate Procedure governs petitions for discretionary review by this court. Subdivision 1 of Rule 117 states:
Any party seeking review of a decision of the Court of Appeals shall separately petition the Supreme Court. The petition with proof of service shall be filed with the clerk of the appellate courts within 30 days of the filing of the Court of Appeals' decision. A filing fee of $550 shall be paid to the clerk of the appellate courts.
Minn. R. Civ. App. P. 117, subd. 1. The court of appeals' decision in this case was filed on April 10, 2017. Webster filed a petition for review on April 19, 2017, and the County filed its submission on May 5, 2017-within the 30 days specified by Rule 117, subdivision 1. The County did not pay a filing fee, but it was not required to do so. See Minn. R. Civ. App. P. 103.01, subd. 3(d) (waiving the filing fee for government entities); see also Minn. R. Civ. App. P. 115.03, subd. 3. Because the County's submission met all the requirements set out in subdivision 1, in my view it adequately invoked our jurisdiction.
To be sure, the County's submission was titled "Response to Petition for Review of Court of Appeals' Decision," rather than being styled as a request for review in its own right. But the County did, in fact, separately request review of the issues that the court claims that we lack authority to hear. The County's submission begins by stating that respondents "agree ... that this Court should review whether the Court of Appeals erred in concluding that Mr. Webster's e-mail term search demand was a proper request for data under the Minnesota Government Data Practices Act ("MGDPA") (Question #3 in Mr. Webster's petition)."
The County goes on to refer to this issue as one "upon which review is requested by both parties ." (Emphasis added.) And in the argument section of its submission, the County squarely stated that "[t]his Court should grant review and resolve whether the MGDPA supports the conclusion that a data request extends to extremely broad term-search demands." In short, the County clearly made a "separate" request for review as that term is used in Rule 117, subdivision 1-that is, it made a request for review, in its own filing, that was distinct from Webster's request.
Furthermore, we have the authority to treat the County's response to Webster's petition as a request for conditional cross-review under Rule 117, subdivision 4. That provision states that an "opposing party," such as the County, "may file ... a response *436 to the petition" that "conditionally seek[s] review of additional designated issues not raised by the petition." Minn. R. Civ. App. P. 117, subd. 4. As stated above, I agree with the court that Webster could not, and did not, properly raise these issues in his petition for review because he was not the aggrieved party. But the court goes one step further, reasoning that even though these issues were improperly raised, they were nevertheless "raised by the petition" under Rule 117, subdivision 4, and therefore the court cannot treat the County's submission as a request for conditional cross-review. In my view, the court's reasoning improperly restricts the scope of conditional review under subdivision 4. Nothing in subdivision 4 restricts the court from addressing issues that were raised in a conditional request for cross-review simply because a petitioner also (improperly) sought review of those same issues.
However the County's submission is viewed, principles of fairness and common sense suggest that we should reach the issues discussed in Part III. See Minn. R. Civ. App. P. 103.04 (providing that the appellate courts may take action "as the interest of justice may require"). It would appear to an outside observer that the court agreed: after all, we granted review of these issues. The court's technical holding that we lack jurisdiction is based solely on the parties' submissions, but those submissions have not changed since they were initially filed and we granted review.
Furthermore, the keyword-search and undue-burden issues warrant review by this court. They are "important [questions] upon which the Supreme Court should rule," and reaching the merits of these matters would "help develop, clarify, [and] harmonize the law" governing requests under the Minnesota Government Data Practices Act. Minn. R. Civ. App. P. 117, subd. 2(a), (d). These issues surely have "possible statewide impact" and are "likely to recur." Id. , subd. 2(d)(2), (3). The court's decision today unnecessarily avoids and postpones determining the merits of two consequential legal issues for which our review was adequately invoked.
Accordingly, I respectfully dissent from Part III of the court's decision.

Biometric technology combines biometrics, "the science of identifying a person by a specific physical characteristic[,]" with technology, such as fingerprint or iris scanners. See EyeTicket Corp. v. Unisys Corp. , 155 F.Supp.2d 527, 531 (E.D. Va. 2001).
According to amici American Civil Liberties Union of Minnesota and Electronic Frontier Foundation (EFF), Webster was responding to a "call to action" from EFF to which several hundred other people responded by filing similar requests. Amici claim that government data received from those requests demonstrates an increasing use of biometric technology by state and local governments across the country. Amici contend further that, in light of standard industry best practices, the County's procedures in responding to requests for electronically stored information are inadequate.

Webster made several attempts to arrange an inspection date for the responses to requests 1 through 3. Although the inspection was initially scheduled for December 14, 2015, the Sheriff's Office cancelled and rescheduled the inspection to December 21, 2015. When Webster inspected the data, he encountered redactions but no citations to specific statutory authority to explain the denials of access. Minn. Stat. § 13.03, subd. 3(f). Webster was also provided 279 emails, some with redactions, from a test search responsive to request 14. When he asked about the redactions, he was told that Lahti-Johnson would call him. She did not. The ALJ found this conduct in failing to respond violated Minn. Stat. § 13.03, subd. 3(f). The County did not appeal that determination.

PST stands for "Personal Storage Table," and is the container file format that Microsoft Exchange and Outlook use to store user emails. See What Does That Mean? A Supplemental Glossary of Modern Tech Terms , 25 No. 2 Lawyer's PC 5 (Oct. 15, 2007).

Deduplication is the "eliminat[ion] [of] duplicate documents." John B. v. Goetz , 879 F.Supp.2d 787, 835 (M.D. Tenn. 2010).

Webster appealed the ALJ's grant of the stay. We affirmed. See Webster v. Hennepin Cty. , 891 N.W.2d 290, 290-91 (Minn. 2017).

Minnesota Statutes §§ 14.63 -.69 (2016) are part of the Administrative Procedure Act and govern judicial review of "contested cases" resulting from agency determinations. The Data Practices Act expressly adopts the scope of judicial review from section 14.69 but states that proceedings on a data-practices complaint are not a "contested case" and are not otherwise governed by chapter 14. Minn. Stat. § 13.085, subd. 5(d).

In Booher , we set forth both the statutory standard and a common law standard. 260 N.W.2d at 183. "Our scope of review is that prescribed by Minn. St. [§] 15.0425. The commissioner's findings are reviewed in the light most favorable to his decision, and where there is evidence reasonably tending to sustain them, the findings will not be disturbed." Id. (citing Nyberg v. R.N. Cardozo & Brother, Inc. , 243 Minn. 361, 67 N.W.2d 821 (1954) ).

The material facts are undisputed and both parties agree that we give deference to the ALJ's factual findings.

Webster calls this view, as advanced by the County, a "pattern or practice" standard.

This conclusion is consistent with the presumption in the Data Practices Act that public government data must be made accessible to the public for copying and inspection. Minn. Stat. § 13.01, subd. 3 ; KSTP-TV , 884 N.W.2d at 345.

Webster argues that Rule 117 allows "any party" to petition for "review of a decision of the Court of Appeals," id. , subd. 1, and that "the question presented is an important one," id. , subd. 2(a). According to Webster, these questions are important and potentially injurious to him because the court of appeals' opinion was unpublished and contained statements that are arguably obiter dictum but that the County could rely on, adverse to Webster's interests, in responding to Webster's request. Hypothetical, future injuries, however, are insufficient to support standing. See McCaughtry v. City of Red Wing , 808 N.W.2d 331, 338 (Minn. 2011). Moreover, we are not persuaded that potential obiter dictum in a nonprecedential, unpublished opinion poses an important question having statewide impact.