HUDSON, Justice (dissenting).
On August 1, 2016, 3-year-old G.B. wandered 2½ blocks from Restorff's home daycare facility. He was standing next to a busy highway when a neighbor found him. Law enforcement subsequently returned G.B. to Restorff's home. Although G.B. was not harmed, that fact does nothing to negate the substantial record evidence demonstrating that Restorff failed to properly provide for G.B.'s supervision and thus committed neglect of a minor. Accordingly, I respectfully dissent.
I agree with the court's interpretation of "provide for" in part I(A) of the court's opinion. I also agree that the Commissioner erred in importing the definition of "supervision" from the daycare licensing rules.[1] I dissent, however, because substantial evidence in the record shows that Restorff's supervision was not "appropriate" as required by clause 3 of Minn. Stat. § 626.556, subd. 2(g) (2018) ("Clause 3").
"[I]f the record, when considered in its entirety, contains substantial evidence supporting the administrative decision, [we] must uphold the agency ruling." Urban Council on Mobility v. Minn. Dep't of Nat. Res. , 289 N.W.2d 729, 733 (Minn. 1980) ; see also Webster v. Hennepin County , 910 N.W.2d 420, 428 (Minn. 2018).
Here, there is substantial evidence in the record to support the Commissioner's determination that the supervision was not appropriate. The Commissioner relied, in part, on the licensing rules definition, but she also relied on factors from Clause 3. These factors include the "length of absence." Minn. Stat. § 626.556, subd. 2(g)(3). Granted, the Commissioner did not make a specific finding about how long the children were outside, but the estimates that she gave, ranging from 3 to 10 minutes, were sufficient. As the Commissioner stated, in the end, it does not matter whether the time frame that Restorff was indoors was closer to 10 minutes or 5 minutes-under any of these time frames, the child care arrangement she had in *26 place was insufficient to provide the necessary supervision for an active toddler.
The court notes that DHS approved of the conditions of Restorff's daycare facility by issuing Restorff a license. But the DHS-approved conditions-the number of children Restorff was permitted to care for, the fact that she had a helper, and the fact that her yard was unfenced-did not negate Restorff's responsibility to properly supervise the children within the parameters of her license. Even if Restorff's supervision plan was appropriate, her execution of the plan-i.e., the supervision itself-was not. The record evidence shows that 12 children-4 of whom were under 5 years old-were being supervised by a 13-year-old (Emma) who was playing with some of the children on the swing set. But Emma was apparently unaware of the activities of the others, including G.B.[2]
Restorff acknowledged that it was her responsibility to ensure that Emma was providing adequate supervision. Restorff neglected that responsibility. The record further establishes that neither Restorff nor Emma noticed G.B.'s absence until Restorff discovered that she had an extra bowl of cereal. G.B. was able to leave the yard unnoticed and wander for 2½ blocks, at which point he was found not by Restorff or Emma, but by a neighbor.
Although Restorff testified that she was not aware that G.B. had a tendency to wander, it is common knowledge that children of G.B.'s age wander when they are not adequately supervised. See generally Senogles v. Carlson , 902 N.W.2d 38, 47-48 & n.13 (Minn. 2017) (noting that "children often behave in dangerous ways" and parents "understand the proclivity of young children to wander off quickly to pursue whatever curiosity intrigues them"). Restorff's usual practice of keeping children under 5 years old on her gated deck is evidence that she understood the danger of allowing young children to roam outside unattended. Restorff's own statements provide further support that she understood the danger: the Commissioner's final agency decision states that Restorff said that she usually did not let G.B. go outside without her, due to his age. In her testimony, Restorff explained that she set "very clear boundaries" when the children played outside, but that the "little" children, like 3-year-old G.B., did not always follow the rules. Restorff also noted that, in "[t]oday's world you can't trust anybody.... [P]eople walk through [the] neighborhood, bikers ... anything." These statements show that Restorff was aware of the risk for a largely unattended 3-year-old child to wander from an unfenced back yard. Restorff failed to take her usual precautions on the day that G.B. wandered away, and, thus, she failed to adequately supervise him.
*27 The court also concludes that the Commissioner did not conduct a fact-specific examination to determine whether Restorff's supervision plan was appropriate under the circumstances in light of the length of her absence. I disagree. The Commissioner noted "G.B.'s age, his mental ability, and his being permitted in the unfenced back yard when [Restorff] was not present outdoors." Thus, the Commissioner's analysis was not a strict-liability analysis, as the court claims. Although the analysis could have been more specific, it was sufficient to support the obvious: that 3-year-old children wander and do not have the mental development to appreciate dangers or risks or make rational decisions. But the court claims that the Commissioner did not actually use the facts she laid out at the outset of the analysis in reaching his decision. The court is wrong. The Commissioner concluded her analysis by stating: "Because G.B. was able to wander away without [Restorff's] knowledge, and because G.B. as a child under 4 years of age did not have the mental capacity to appreciate the danger of leaving the confines of the back yard and walking toward a busy street , [Restorff] did not provide the necessary supervision to G.B. on August 1, 2016." (Emphasis added.) The Commissioner applied the Clause 3 factors. But even if the court is correct, "[o]ur guiding principle is that if the ruling by the agency decision-maker is supported by substantial evidence, it must be affirmed." In re Blue Cross & Blue Shield of Minn. , 624 N.W.2d 264, 279 (Minn. 2001). Here, the Commissioner's decision was supported by substantial evidence-evidence that the Commissioner carefully laid out in her decision.
Finally, the court endorses Restorff's exaggerated argument that, under the Commissioner's interpretation of the rule, every caregiver who has a child wander away is liable for maltreatment. This is incorrect-a determination of maltreatment under the Commissioner's interpretation depends on the age of the child at issue and the mechanisms the caregiver had in place to prevent the child from wandering, factors that the Commissioner took into account here.
We should not take this episode lightly simply because the total elapsed time may, in some eyes, be considered brief or because the child returned unharmed. In recent years, maltreatment reports to local child protection agencies across Minnesota have been on the rise. Between 2011 and 2015, reports of neglect (which include maltreatment of both vulnerable adults and minors) to DHS increased by 24 percent.[3] In 2017, Minnesota child protection agencies received 4.8 percent more reports of child maltreatment than they received in 2016.[4] And DHS has often been roundly and publicly criticized for not doing enough to protect children.[5] Here, DHS
*28 acted swiftly and definitively to safeguard children.[6]
Pursuant to the Commissioner's final decision, G.B. arrived at Restorff's home by 8:30 a.m., and Restorff brought breakfast outside at 8:45 a.m. Although the Commissioner does not make a specific finding about how long the children were outside, she estimated that it was between 3 and 10 minutes. In any event, as the court notes, G.B. was found by a neighbor around 8:47 a.m. And Restorff reported G.B. missing at 9:06 a.m. Thankfully, he was not harmed. But that was pure fortuity. I question whether we would be here parsing 5-10 minute increments if G.B. had been hit and killed by a semi-truck on County Road 39 that morning. We should call this what it is-neglect-and affirm the Commissioner's determination that permitting a 13-year-old to watch 12 children in an unfenced yard, including four children under the age of 5, is an inadequate supervision plan, especially when the "watching" consists primarily of pushing some of the children in a swing set while the others-including G.B.-were left unattended. The Commissioner fulfilled her responsibilities here, and the record amply supports her determination of neglect.

Although we must go where the law leads us, there is an air of unreality permeating this discussion. Even if not expressly applicable, the licensing rules are clearly relevant, as the entity at issue here is a licensed daycare facility entrusted with the protection and proper care of children. See, e.g. , Minn. R. 9502.0325, subp. 1 (2017) ("The purpose of [the rules] is to establish procedures and standards for licensing family day care and group family day care homes to ensure that minimum levels of care and service are given and the protection, proper care, health, safety, and development of the children are assured."). Both parties utilized and referenced various parts of the licensing rules throughout this case and in their briefs. Even Restorff equivocates on whether using the licensing rules is appropriate here, calling it "debatable."

The court claims that I have engaged in "judicial fact-finding" in my description of Emma's supervision. But the court ignores the totality of the record. In her final agency decision, the Commissioner found that Restorff "sent the children, including G.B., into the back yard, where they were in the presence of [Restorff's] assistant." Granted, the Commissioner did not expressly state that Emma was playing with some of the children on the swing set, but we know that to be the case because Restorff herself so testified. Tellingly, in its factual recitation, the court relies on this testimony from Restorff as well. The court specifically states that "Emma was pushing children on a swing set outside while Restorff finished getting breakfast ready back in the house." It would be a Herculean feat for Emma to push all 12 children in swings at the same time; and plainly she was not doing so because when Restorff brought the cereal out to distribute to the children, G.B. was gone. Regarding the varying time frames, the Commissioner determined that under any of the possible time frames, Restorff's supervision was inadequate. This is not judicial fact-finding.

Minn. Dep't of Health & Minn. Dep't of Human Servs., Maltreatment Report: Vulnerable Adults & Minors Served by Minnesota Licensed Providers x (Mar. 4, 2016), https://www.leg.state.mn.us/docs/2016/mandated/160406.pdf.

Minn. Dep't of Human Servs., Minnesota's Child Maltreatment Report , 2017 5 (Nov. 2018), https://www.leg.state.mn.us/docs/2018/mandated/181110.pdf; but see id. (noting that the methodology for calculating the number of reports was modified in 2017 and stating that "[c]aution should be taken when comparing the 2017 total number of reports with numbers from previous publications.").

Jill Riepenhoff et al., A Trifecta of Failures Puts Kids at Risk , KSFY ABC News (last updated Apr. 30, 2019), (noting that the aunt of a child who died in foster care blames Minnesota Child Protection Services, caretakers, and family for the child's death); Joe Heim & Julie Tate, Abuse, Neglect and a System That Failed: The Tragic Lives of the Hart Children , Wash. Post (July 12, 2018), https://www.washingtonpost.com/graphics/2018/national/hart-family-abuse-interstate-adoption/?utm_term=.f0ffe83208de (detailing the highly publicized maltreatment and death of six adopted siblings, stating that "[p]rograms designed to protect children ushered six siblings to their deaths-and no one has been held accountable since their adoptive mother drove them off a cliff," and noting that the children's schools reported multiple incidents to DHS); Paul McEnroe & Brandon Stahl, String of System Failures Preceded Suicidal 6-year-old's Death , Star Trib. (Jan. 18, 2015), http://www.startribune.com/2015-string-of-failures-came-before-suicidal-6-year-old-s-death/288934041 ("Child protection workers and care providers failed to work together for more than a year to safeguard 6-year-old [child] ...."); A.J. Lagoe & Steve Eckert, KARE 11 Investigates: The Life and Death of [a Child ], KARE 11, (last updated Nov. 8, 2018) ("Experts say [the child's] death raises questions about whether child protection workers in two states [including Minnesota] missed clear warnings.").

It is also irrelevant that G.B.'s parents do not blame Restorff. That they do not blame her is surely due, at least in part, to the fact that G.B. was found unharmed. If G.B. had been injured in some way, the position of his parents may have been entirely different. We cannot rely on the outcome here (that G.B. was found unharmed) to determine whether the Commissioner's determination was supported by substantial evidence.